

FILED
CLERK, U.S. DISTRICT COURT

AUG 2 0 2024

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION     BY DEPUTY

FEE DUE

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| SEAN SIMON ROSEMAN,<br><br>Plaintiff,<br><br>vs.<br><br>WALMART, INC., a Delaware corporation<br><br>Defendants. | Case No:<br><br>EDCV24-01775-CBM-(SPx)<br><br>**EMPLOYMENT DISCRIMINATION COMPLAINT**<br><br>**Prayer: \$18,480,000**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sean Simon Roseman (hereinafter, "Roseman") demands a jury trial and alleges the whole truth and nothing but the truth as follows:

## PARTIES

1.  a. Defendant Walmart, Inc. (hereinafter, "Walmart") is, and at all times mentioned herein, has been a Delaware corporation engaged in the retail sale of a wide variety of merchandise and goods, including at a store located at 4210

1

Employment Discrimination Complaint

Highland Ave, Highland, CA 92346 (where the discrimination occurred.) Walmart conducts regular, sustained business activity in San Bernardino County at this location.

b. Walmart, Inc. (hereinafter, "Walmart") is a corporation organized under the laws of Delaware and has its principal place of business, corporate office, in Arkansas, at 702 S.W. 8th Street, Bentonville, Arkansas 72716.

2. On information and belief, Alex Ocampo (hereinafter, "Ocampo") is a resident of San Bernardino County and employed by Walmart, Inc. as hiring manager.

3. On information and belief, Shyla (hereinafter, "Shyla") is a resident of San Bernardino County and employed by Walmart, Inc. as a manager.

4. Roseman is a full-time resident of San Bernardino County. He is a lawful permanent resident since June 28, 1982, and of Jewish descent.

## <u>LAWS GOVERNING THE HEREIN DISCRIMINATION</u>

5. <u>Title VII of the Civil Rights Act of 1964</u>:

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity) or national origin.

"The U.S. Equal Employment Opportunity Commission (EEOC) was created by the Act and opened its doors in 1965 to prevent and remedy unlawful employment discrimination and advance equal employment opportunity for all. The Act, strengthened over time by amendments, also paved the way and provided a model for other civil rights laws. Over the next 60 years, Congress authorized the EEOC to enforce 9 key federal laws to protect working people from discrimination on the

2

Employment Discrimination Complaint

job."-Source https://www.eeoc.gov/title-vii-civil-rights-act-1964-requiring-discrimination-free-workplaces-60-years

6. The Immigration and Nationality Act's (INA) anti-discrimination provision, 8 U.S.C. § 1324b:

1) Citizenship status discrimination with respect to hiring, firing, and recruitment or referral for a fee by employers with four or more employees.

Employers with four or more employees are not allowed to treat individuals differently in hiring, firing, recruitment or referral for a fee based on citizenship status. You can get more information about citizenship status discrimination by contacting IER and at 8 U.S.C. § 1324b(a)(1)(B). Citizenship status includes a person's immigration status. U.S. citizens, U.S. nationals, asylees, refugees, and recent lawful permanent residents are protected from citizenship status discrimination. Exceptions: lawful permanent residents who do not apply for naturalization within six months of eligibility by virtue of their period of residency are not protected from citizenship status discrimination. An employer may restrict hiring to U.S. citizen only if a law, regulation, executive order, or government contract requires the employer to do so.

2) National origin discrimination with respect to hiring, firing, and recruitment or referral for a fee by employers with four to 14 employees.

Employers are not allowed to treat individuals differently in hiring, firing, recruitment or referral for a fee because of their actual or apparent national origin, including but not limited to their place of birth, country of origin, ancestry, native language, because they are perceived as looking or sounding "foreign," or any other national origin indicator. All work-authorized individuals are protected from national origin discrimination by small employers under 8 U.S.C. §

Employment Discrimination Complaint

1324b(a)(1)(A).  The Equal Employment Opportunity Commission has jurisdiction over employers with 15 or more employees under Title VII of the Civil Rights Act, as amended, found at 42 U.S.C. § 2000e-2.

3) Unfair documentary practices related to verifying the employment eligibility of employees.

Under the law that IER enforces, when verifying a workers' employment authorization, employers of any size are not allowed to demand more or different documents than necessary, request specific documents, or reject reasonably genuine-looking documents because of a worker's citizenship, immigration status, or national origin.  This type of discrimination generally happens during the Form I-9 and E-Verify processes.  The part of the law that prohibits this type of discrimination is at 8 U.S.C. § 1324b(a)(6).

4) Retaliation/Intimidation.

Employers of any size are not allowed to intimidate, threaten, coerce, or retaliate against individuals for filing charges with IER, cooperating with an IER investigation, opposing action that may constitute unfair documentary practices or discrimination based upon citizenship status, or national origin, or otherwise asserting their rights under the INA's anti-discrimination provision.  Learn more about unlawful intimidation and retaliation by contacting IER and at 8 U.S.C. § 1324b(a)(5).

7. Senate Bill 1001 Amended the California Labor Code to Expand Protection from Unfair Immigration-Related Practices:

Senate Bill 1001 expands existing prohibitions regarding unfair immigration-related practices.  Specifically, this bill amends the California Labor Code to provide a civil remedy for an applicant or employee against any unfair

4

Employment Discrimination Complaint

immigration-related practice as defined by Labor Code section 1019. Such "unfair immigration-related practices" include an employer requesting more or different documents than required under federal law for verification purposes, using the federal E-Verify system to check the status of a person at a time or in a manner not required, threatening to file or filing a false police report or a false report with a state or federal agency, threatening to contact or contacting immigration authorities, or refusing to honor documents that appear reasonably genuine. In addition, the following practices would also be prohibited: discriminating against an immigrant with authorization to work based on having the status of immigrant, or attempting to reinvestigate or re-verify an incumbent employee's authorization to work where not legally required to do so. SB 1001 permits an applicant or employee suffering an unfair immigration-related practice prohibited to bring a civil action for equitable relief and any applicable damages or penalties, and would allow recovery of reasonable attorneys' fees and expert witness costs if the employee or applicant is the prevailing party in the action. SB 1001 became effective on January 1, 2017.

Document abuse may occur in the workplace against newly hired or existing employees. For newly hired employees, it can happen when an employer does not accept employment authorization documents that are legally acceptable under the "I-9 form". The employer instead asks the worker for specific documents or requests more or different documents than are required by the I-9 form.

SB 1001, sponsored by MALDEF & the CA Immigrant Policy Center, was signed into law in 2016. The bill protects workers by prohibiting employers from:

- Requesting more or different documents than are required under federal law;
- Refusing to honor documents that reasonably appear to be genuine;

5

Employment Discrimination Complaint

- Refusing to honor documents or work authorization based upon the immigration status that accompanies the work authorization; and;
- Attempting to reinvestigate or re-verify a current employee's work authorization in a way not required by federal law.

SOME EXAMPLES OF DOCUMENT ABUSE INCLUDE, BUT ARE NOT LIMITED TO:

- An employer demands to see a worker's U.S. passport
- An employer requires some U.S. citizens to provide certificates of naturalization.
- **An employer asks for an Employment Authorization Document (EAD) although the worker has already shown a state identification card and an unrestricted Social Security card.**
- An employer refuses to accept the EAD because it has a future expiration date.

8. California FEHA is a comprehensive set of laws that prohibit discrimination and harassment based on various protected characteristics, including but not limited to race, color, religion, sex, gender, sexual orientation, national origin, disability, medical condition, marital status, and age. It applies to both public and private employers with five or more employees, as well as housing providers, landlords, and real estate agents.

1. Employment Discrimination: Employers cannot discriminate against employees or job applicants in **any** respect of employment, including recruitment, hiring, promotions, compensation, benefits, or termination, based on the protected characteristics mentioned earlier.

6

Employment Discrimination Complaint

2. Harassment: FEHA prohibits any form of harassment based on protected characteristics. Harassment includes offensive jokes, slurs, derogatory remarks, unwelcome physical contact, or creating a hostile work environment. Employers must take prompt and appropriate action to address harassment complaints.

3. Retaliation: FEHA protects individuals who oppose discrimination or harassment, file complaints, or participate in investigations from retaliation. Employers cannot take adverse actions, such as termination or demotion, against employees for engaging in protected activities.

## INTRODUCTION

9. Roseman was hired by Alex Ocampo hiring manager for Walmart on November 30, 2023, as a full-time remodel associate. Ocampo informed Roseman he would need his unexpired California Driver's License and his unrestricted Social Security Card for employment verification purposes while attending his orientation scheduled for December 5, 2023.

10. While attending orientation on December 5, 2023, and afterward through the next two days Roseman experienced several different forms of discrimination, intersectional discrimination, intimidation, retaliation, and discriminatory harassment from three different Walmart managers. Roseman was not allowed to complete his I-9 form and as a result was wrongfully terminated.

11. Roseman's rights were violated denying him equal opportunity to complete his I-9 form while the other six employees attending orientation with him were allowed to complete their orientation, receive their vests, and name tags. Roseman was the only white employee of the seven. The remaining six employees who were allowed to proceed with their orientation were Latino and African American.

7

Employment Discrimination Complaint

12. The impact of the psychological and emotional abuse by these three managers through intentional chastisement, retaliation, and intimidation caused Roseman to question his views of reality and influence his way of thinking causing him to question his accepted environment further complicating the discrimination and compounding the injury a result of it.

13. The intersectional discriminatory harassment, the several different forms of discrimination, the retaliation and intimidation, and involuntary wrongful termination caused great harm and injury to Roseman who was trying to make sense of and understand it. After the discrimination was unfairly waged against Roseman for no apparent reason, Walmart continued with the abuse by offering no explanation or apology, continuing to deny any wrongdoing, and even asking Roseman to sign an agreement promising never to apply for employment with Walmart again, further discriminating, in exchange for $5,000 payment and ceasing to continue any legal action.

14. Employers cannot discriminate when:

- Hiring a new employee;
- Verifying an employee's authorization to work on the form I-9;
- Electronically confirming identity and employment authorization with E-verify, including in the E-verify tentative non-confirmation (mismatch) process;
- Terminating a person's employment.

15. Discrimination can occur in the hiring process when a job applicant is treated unfairly or unequally because he or she belongs to a protected class. The California Fair Employment and Housing Act (FEHA) and several other federal laws prohibit discrimination in the hiring process.

8

Employment Discrimination Complaint

## MEMBER OF A PROTECTED CLASS

### Immigrant from a Foreign Country

16. Roseman is an immigrant from South Africa and a lawful permanent resident since June 28, 1982. According to the California Civil Rights Department all immigrants are protected against discrimination because of their race, ethnicity, ancestry, national origin, sex, sexual orientation, gender identity, disability, religion, and certain other characteristics, as well as primary language, immigration status, and citizenship.

17. Not applying for citizenship within six months of becoming a lawful permanent resident alone does not disqualify an immigrant from the protections provided by the California Civil Rights Department or any other similar law as a member of a protected class.

18. All immigrants are protected against discrimination. Becoming a lawful permanent resident does not disqualify or change an immigrant's class as an immigrant. A "Green Card" holder is still an immigrant now with permanent resident status. When a person becomes a citizen through naturalization then his/her immigrant status changes to U.S citizen.

19. A lawful permanent resident is still an immigrant from a foreign country and member of a protected class. Roseman is an immigrant from South Africa and a member of a protected class according to the California Civil Rights Department.

### Race of Jewish Descent

20. Roseman is of Jewish descent and his sister is a devout follower in Judaism. His brother-in-law is currently studying to become a Rabbi. A Chinese Rabbi. Roseman considers himself Jewish and of Jewish origin from his home country South Africa.

Employment Discrimination Complaint

21. Jewish people are protected by a law against racial discrimination in employment decisions, a federal magistrate judge recently concluded in siding with a football coach suing a private Baptist college in Louisiana. He concluded that Jewish citizens have been treated as a racial or ethnic group entitled to the law's protection against employment discrimination.

"Recently, a federal magistrate judge in Louisiana denied a motion to dismiss in a case in which the defendant is alleged to have refused to hire a football coach because of his "Jewish blood." Bonadona v. Louisiana College (W.D. La. July 13, 2018).

The case involves Joshua Bonadona, the son of a Jewish mother and a Catholic father. Though Bonadona was raised in the Jewish religion, he converted to Christianity while attending Louisiana College (LC) as a student and football player. LC is a Baptist college built on a "Christian worldview." Its mission statement includes numerous statements referencing God, the Church, scripture, salvation, baptism, and other religious principles.

Bonadona openly displayed his new faith, made it publicly known to the team, and often led its Christian devotional services. After graduating from LC in 2013, the school hired him as an assistant football coach. He worked at LC until June 2015, when he left to pursue a graduate degree and a football coaching position at Southeast Missouri State University.

In 2017, he applied for a position with LC as a defensive backs coach. During the application process, he described himself as a Baptist and a practicing member of the Christian faith. LC head football coach Justin Charles, who had invited

10

Employment Discrimination Complaint

Bonadona to apply for the position, recommended him for the job to LC President Dr. Rick Brewer.

A week after Bonadona's interview with Dr. Brewer, however, Charles called Bonadona and told him that the college had decided not to hire him.  When Bonadona asked Charles for clarification, Charles stated that Brewer had refused to approve his hiring because of "what Dr. Brewer called [Bonadona's] 'Jewish blood.'"  Bonadona subsequently sued LC and Dr. Brewer, filing claims under both Title VII of the Civil Rights Act of 1964 and Section 1981.

Title VII makes it an unlawful employment practice for an employer to refuse to hire an individual on the basis of his or her race, color, religion, sex, or national origin. Typically, discrimination cases involving Jewish persons arise as a result of the person's religion. However, in Bonadona's case, he is not a member of the Jewish faith, but rather a man of Jewish descent. This racial rather than religious approach to the issue makes Bonadona's case noteworthy.

Similarly, Section 1981, which was passed as part of the Civil Rights Act of 1866, prohibits contractual discrimination based on race (but not color, religion, or sex). More than thirty years ago, in a pair of companion cases, the Supreme Court concluded that both Jews and persons of Arab descent could bring actionable claims under this statute, consistent with understandings of race that existed at the time that statute was passed over a century earlier.

In their motion to dismiss, LC and Dr. Brewer argued that discriminating based on Jewish ethnic heritage is not discrimination based on race. The court flatly rejected

11

Employment Discrimination Complaint

this notion, relying on cases from other districts to demonstrate that, for the purposes of Title VII, the term "race" "encompasses ethnicity." Therefore, the court held that discrimination on the basis of a person's Jewish ethnic background can be race discrimination, writing that "Jewish citizens have been excluded from certain clubs or neighborhoods, and they have been denied jobs and other opportunities based on the fact that they were Jewish, with no particular concern as to a given individual's religious leanings. Thus, they have been treated like a racial or ethnic group that Title VII was designed to protect from employment discrimination based on membership in that group." Furthermore, although individuals like Dr. Brewer cannot be liable under Title VII, the court recommended that Bonadona's Section 1981 claim be allowed to proceed to discovery against both defendants. It remains to be seen who will ultimately prevail.

Aside from drawing on precedent establishing the legal concept of a Jewish "race" in the eyes of the law when it comes to protecting against discrimination under Title VII, this case also presents a useful reminder for employers that, regardless of how to classify a particular protected trait, evaluation of employees should center on job performance and merit.

Kollman & Saucier acknowledges and appreciates the significant work that law student intern, Yitzchak Besser, put into preparing this blog post."

Reference: KS Kollman & Saucier, P.A.

https://www.kollmanlaw.com/employment-discrimination/louisiana-judge-holds-jewish-heritage-can-basis-race-discrimination-claim/

22. Roseman is Jewish and of Jewish descent. Roseman considers himself Jewish and is therefore a member of a protected racial class and a minority.

Employment Discrimination Complaint

## STATEMENT OF FACTS

### Walmart Discrimination During Orientation

23. Roseman's Resident Alien "Green Card" was stolen with his wallet approximately two years ago. While Roseman was filling out his I-9 form during orientation after providing two acceptable documents for employment verification he asked Ocampo if he could retrieve his A-number from home located about a mile away. Roseman had stored his A-number on a tablet at his residence.

24. Ocampo insisted he needed to see Roseman's actual "Green Card" and instructed Roseman to stop filling out his I-9. After waiting for approximately twenty minutes while Ocampo assisted another employee with his I-9 form, Roseman again asked if he could retrieve his A-number from his home. After a couple minutes Ocampo said, "go ahead."

25. Roseman left Walmart orientation to retrieve his A-number from home as agreed with Ocampo. After arriving home Roseman printed copies of his "Green Card" photograph that had been taken and stored on his tablet. Roseman drove straight back to Walmart.

26. Returning to Walmart fifteen minutes later with his A-number, Roseman walked into the orientation area and lightly knocked on Ocampo's open office door where Ocampo and the other manager were seated. Roseman alerted Ocampo to having retrieved his A-number when Ocampo said he checked and they were going to need to see Roseman's actual physical "Green Card." Attention drawn to Roseman carrying photocopies of his "Green Card" Ocampo snapped, "We can't take that! Those are photocopies of the card, we need the actual card!"

27. Roseman responded to Ocampo saying he just needed to complete his I-9 form that's why he drove home to retrieve it as agreed with Ocampo before he left. Roseman said he didn't drive home to retrieve photocopies of his "Green Card" to

13

Employment Discrimination Complaint

check its validity or authenticity because he had already told Ocampo it was stolen. Roseman also stated for the record that he had already provided his two forms of ID to verify identification and employment. His unexpired California Driver's License and his unrestricted Social Security Card. Both were new having been replaced after his wallet was stolen two years prior. Roseman asked if he could go into the computer room adjacent to Ocampo's office and complete his I-9 form when he was again denied. Roseman did not understand why Ocampo was insisting on seeing his actual physical "Green Card" especially after informing him it had been stolen.

28. Ocampo would not allow Roseman to complete his I-9 form. Several more requests were made by Roseman to allow him to complete his I-9 form. Ocampo then extended his right arm with the palm of his hand open face up while tapping it with his other hand saying, "I need the ACTUAL PHYSICAL CARD IN-MY-HAND." At that point the other manager stood up and seconded the motion saying, "IN-HIS-HAND. We need the actual physical card." Ocampo then added, "I need the actual physical card or a receipt." Roseman did not have the money to renew his "Green Card" online for receipt. Roseman felt embarrassed having to verbally communicate this to Ocampo in front of the assisting manager in the office and the rest of the orientation class that were sitting just fifteen feet away who had already completed their orientation.

29. Both managers were speaking to Roseman with smiles on their faces chastising Roseman who was patiently asking if he could just complete his I-9 form. Ocampo and the other manager sitting in his office denied all attempts at completing his I-9 form.

30. While chastising Roseman with a smile on his face acting as if the whole incident was a joke, Ocampo delivered his final word as hiring manager on that

14

Employment Discrimination Complaint

day, "Even if you would have been allowed to complete your I-9 form we would have still asked to see your "Green Card" anyways!" A demonstration of the actual discrimination being waged against Roseman. This intentional type of intersectional discrimination and abuse is more serious than any one of the managers or inside counsel has been capable of understanding. Nor willing to admit.

**Walmart Discrimination Over The Telephone w/Assisting Manager**

31. Giving the two managers benefit of the doubt Roseman decided to call Walmart Human Resources as soon as he returned home. Roseman wanted to complete his I-9 form.

32. Roseman called Walmart Human Resources and the same manager that was in the office assisting Ocampo answered the telephone. He asked her if she was the same woman he had just spoken to and she answered yes. Roseman asked to speak to Ocampo but the woman said he was busy and could not speak.

33. Roseman took his time to slowly and clearly explain that he had provided his unexpired California Driver's License and his unrestricted Social Security Card as verification of employment. The same two forms of ID Ocampo had originally told him to bring to orientation. Roseman was confused and asked the manager over the telephone why they didn't allow him to complete his I-9 form? The manager didn't answer question. She asked Roseman if his Social Security Card had restrictions on it? Roseman said he didn't think so because he had never heard of a Social Security Card that had restrictions on it. Roseman pulled out his wallet and took out his Social Security Card. Upon checking he verified there were no restrictions on the card. The manager then said, "We'll still need to see the Resident Alien Card." Roseman was confused and didn't understand why the

Employment Discrimination Complaint

manager asked if his Social Security Card had restrictions on it if she was still going to insist on seeing his "Green Card". Roseman said thank you and ended the phone call.

### Walmart Discrimination Next Day w/Different Manager

34. The next day, December 6, 2023, Roseman drove back to the Walmart store to speak to Ocampo in person. After arriving Roseman walked to the back of the store and asked an associate if he could speak to Ocampo. The associate answered it was Ocampo's day off. Roseman then asked if he could speak to a different manager. The associate escorted Roseman to the front of the store to one of the managers offices.

35. An African American woman was seated with a document on the table in front of her. To the right was a manager working on a computer. The two women were speaking to each other when Roseman entered the room. Roseman asked to speak to a manager. The woman seated to the right answered she was a manager. The woman seemed to be focused on her work and did not turn her head when she answered. Roseman introduced himself and politely explained he had been hired on November 30, 2023, and had attended orientation the day before on December 5, 2023.

36. When the manager turned to face Roseman she seemed agitated. Roseman attempted to explain the events that took place the day before while attending orientation. Roseman asked why he would need his "Green Card" after he had already provided the two forms of ID Ocampo requested verifying his employment. Roseman stated he only needed his A-number to complete his I-9 form. The manager answered Roseman if that's what Ocampo requested then that's what it was. The manager said he was following Walmart policy and there was

16

Employment Discrimination Complaint

nothing anybody could do about it and if Ocampo did anything that was against policy he could be fired.

37. Roseman said he was just trying to complete his I-9 form. Roseman stated that he had followed all the rules the day before while attending orientation and just wanted to complete his I-9 form but had been denied. The manager then began insinuating that Roseman had attempted to fill out the form incorrectly the day before and have Ocampo agree to it. The manager said he would have gotten into trouble over that. Roseman answered he had done nothing wrong and did not attempt to fill out the form incorrectly. He reiterated that he was completely honest with Ocampo while attending orientation and followed all instructions.

38. Roseman informed the manager that it was against federal law to discriminate against him during the hiring process. He informed the manager that he had made a complaint with the United States Department of Justice, Civil Rights Division, Immigrant & Employee Rights Section. Roseman was looking for assistance regarding the situation and was hoping the manager would help him. The manager had an angry demeanor with Roseman.

39. Roseman said he just wanted to complete his I-9 form so he could begin work. He confirmed the events from the day before and stated he was completely honest with Ocampo and had done nothing wrong. Roseman stated he just wanted to begin working. Roseman was hoping the manager would assist him when she rudely interrupted saying, "You keep repeating yourself and I already gave you my answer and nothing is going to change!" Roseman was surprised at her actions and the way she was speaking to him. He then asked her for her name and a phone number for corporate so he could speak to someone with more authority. The manager answered her name was Shyla and instructed Roseman to call 1-700-WALMART. Roseman said thank you and shook her hand then left the building.

Employment Discrimination Complaint

## FIRST CLAIM FOR RELIEF

### Violation of Title VII of the Civil Rights Act of 1964 ~ Color

40. The newly hired employees by Walmart who were attending their orientation on December 5, 2023, consisted of seven people. Five Latinos, one African American, and one Caucasian. Roseman was the only white person attending orientation.

41. While Roseman was attending orientation on December 5, 2023, Walmart and its staff of employed managers violated Title VII of the Civil Rights Act of 1964 which prohibits discrimination on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity) or national origin. Roseman was discriminated against by color violating Title VII of the Civil Rights Act of 1964:

- Roseman was a member of a protected class white in color;
- Roseman was qualified for the position he had been hired as Remodel Associate having been a licensed contractor since June of 1999;
- The other six employees, five who were of Latino descent and one of African American descent were allowed to complete their I-9 forms and thus their orientation to receive their new employee vests, and name tags;
- Roseman, the only employee white in color attending orientation was not allowed to complete his I-9 form even after providing correct documentation validating his identification and employment status which resulted in involuntary wrongful termination three days later.

42. The Walmart store located at 4210 Highland Ave., Highland, CA. 92346 has a predominance of Latino and African Americans employees. There are very few white employees. This is a known fact. Management does not employ non-discriminatory methods in the hiring of new employees.

Employment Discrimination Complaint

43. Walmart and its employed staff of managers for which Walmart is responsible for their selection, hiring, training, and promotion violated the public trust hiring employees from within the surrounding and local areas then intentionally discriminating against them. Intentionally discriminating against Roseman by color.

44. Similarly situated employees of different color were treated differently resulting in disparate treatment discrimination. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $140,000.

45. Walmart should be assessed punitive damages in the amount of $1,400,000 to right a wrong that could never be undone and set an example to deter the defendant and others similarly situated from this and similar kinds of conduct in the future.

## SECOND CLAIM FOR RELIEF

### Violation of Title VII of the Civil Rights Act of 1964 ~ Race

46. The newly hired employees by Walmart who were attending their orientation on December 5, 2023, consisted of seven people. Five Latinos, one African American, and one Caucasian, Roseman who was the only person of Jewish descent while attending orientation.

19

Employment Discrimination Complaint

47. While Roseman was attending orientation on December 5, 2023, <u>Walmart and its staff of employed managers violated Title VII of the Civil Rights Act of 1964 which prohibits discrimination on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity) or national origin. Roseman was discriminated against by race violating Title VII of the Civil Rights Act of 1964:</u>

- Roseman was a member of a protected class of Jewish descent;
- Roseman was qualified for the position he had been hired as Remodel Associate having been a licensed contractor since June of 1999;
- The other six employees, five who were of Latino descent and one of African American descent were allowed to complete their I-9 forms and thus their orientation to receive their new employee vests, and name tags;
- Roseman, the only employee of Jewish descent attending orientation was not allowed to complete his I-9 form even after providing correct documentation validating his identification and employment status which resulted in involuntary wrongful termination three days later.

48. It is not difficult to understand why somebody of Jewish descent would be discriminated against by his/her race with the prevailing anti-Semitism across the country and hate crimes against people of Jewish descent. Roseman's last name, Roseman, is an obvious indicator of Jewish descent. While speaking with others during his orientation Roseman clearly mentioned his Jewish descent and country of origin, South Africa. Ocampo was within six feet hearing distance. Ocampo clearly overheard conversation regarding Roseman being of Jewish descent and Ocampo was aware of this fact.

49. Walmart and its employed staff of managers for which Walmart is

20

Employment Discrimination Complaint

responsible for their selection, hiring, training, and promotion violated the public trust hiring employees from within the surrounding and local areas then intentionally discriminating against them. Intentionally discriminating against Roseman by race.

50. Similarly situated employees of different race were treated differently resulting in disparate treatment discrimination. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $140,000.

51. Walmart should be assessed punitive damages in the amount of $1,400,000 to right a wrong that could never be undone and set an example to deter the defendant and others similarly situated from this and similar kinds of conduct in the future.

### THIRD CLAIM FOR RELIEF

### Violation of Title VII of the Civil Rights Act of 1964 ~ National Origin

52. The newly hired employees by Walmart who were attending their orientation on December 5, 2023, consisted of seven people. Five Latinos, one African American, and one Caucasian. Roseman was the only person from his country of origin, South Africa while attending orientation.

53. While Roseman was attending orientation on December 5, 2023, Walmart

Employment Discrimination Complaint

and its staff of employed managers violated Title VII of the Civil Rights Act of 1964 which prohibits discrimination on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity) or national origin. Roseman was discriminated against by national origin violating Title VII of the Civil Rights Act of 1964:

- Roseman was a member of a protected class of national origin;
- Roseman was qualified for the position he had been hired as Remodel Associate having been a licensed contractor since June of 1999;
- The other six employees, five who were of Latino descent and one of African American descent were allowed to complete their I-9 forms and thus their orientation to receive their new employee vests, and name tags;
- Roseman, the only employee from South Africa while attending orientation was not allowed to complete his I-9 form even after providing correct documentation validating his identification and employment status which resulted in involuntary wrongful termination three days later.

54. Roseman is proud of his home country of origin. He is equally proud of being a direct descendant of General Andries Wilhelmus Jacobus Pretorius, first South African President and survivor of the Boer War. While speaking with others during his orientation Roseman clearly mentioned his Jewish descent and country of origin, South Africa. Ocampo was within six feet hearing distance. Ocampo clearly overheard conversation regarding Roseman's home country of origin and Ocampo was aware of this fact.

55. Walmart and its employed staff of managers for which Walmart is responsible for their selection, hiring, training, and promotion violated the public trust hiring employees from within the surrounding and local areas then

22

Employment Discrimination Complaint

intentionally discriminating against them. Intentionally discriminating against Roseman by national origin.

56. Similarly situated employees of different national origin were treated differently resulting in disparate treatment discrimination. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $140,000.

57. Walmart should be assessed punitive damages in the amount of $1,400,000 to right a wrong that could never be undone and set an example to deter the defendant and others similarly situated from this and similar kinds of conduct in the future.

### FOURTH CLAIM FOR RELIEF
### Violation of The Immigration and Nationality Act's (INA) Anti-Discrimination Provision, 8 U.S.C. § 1324b

58. Walmart and its staff of employed managers violated The Immigration and Nationality Act's (INA) anti-discrimination provision, 8 U.S.C. § 1324b:

3) Unfair documentary practices: related to verifying the employment eligibility of employees. Under the law that IER enforces, when verifying a workers' employment authorization, employers of any size are not allowed to demand more or different documents than necessary, request specific documents, or reject

Employment Discrimination Complaint

reasonably genuine-looking documents because of a worker's citizenship, immigration status, or national origin. This type of discrimination generally happens during the Form I-9 and E-Verify processes. The part of the law that prohibits this type of discrimination is at 8 U.S.C. § 1324b(a)(6).

4) <u>Retaliation/Intimidation:</u> Employers of any size are not allowed to intimidate, threaten, coerce, or retaliate against individuals for filing charges with IER, cooperating with an IER investigation, opposing action that may constitute unfair documentary practices or discrimination based upon citizenship status, or national origin, or otherwise asserting their rights under the INA's anti-discrimination provision. Learn more about unlawful intimidation and retaliation by contacting IER and at 8 U.S.C. § 1324b(a)(5).

59. While attending orientation on December 5, 2023, and after returning with his A-number to complete his I-9 form, Roseman's valid work authorization documents were rejected demanding to see his lawful Resident Alien "Green Card". Roseman provided his unexpired California Driver's License and his unrestricted Social Security Card. Roseman was not allowed to complete his I-9 form while the managers insisted on seeing his lawful Resident Alien "Green Card" which had been stolen. While speaking with the two managers during orientation asking if he could complete his I-9 form he was ridiculed, intimidated, and repeatedly denied. As a result, Roseman was wrongfully terminated for no reason because the managers would not allow him to complete his I-9 form.

60. Walmart and its staff of employed managers violated The Immigration and Nationality Act's (INA) anti-discrimination provision, 8 U.S.C. § 1324b:

- Unfair Documentary Practices / Document Abuse;
- Intimidation / Discriminatory Harassment;

Based on Roseman's National Origin.

24

Employment Discrimination Complaint

61. Walmart and its employed staff of managers for which Walmart is responsible for their selection, hiring, promotion, training, and actions violated the public trust hiring employees from within the surrounding and local areas then intentionally discriminating against them, intentionally discriminating against Roseman using Unfair Documentary Practices / Document Abuse and Intimidating him while not allowing him to complete his I-9 form which resulted in Wrongful Termination of employment.

62. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $400,000.

63. Walmart should be assessed punitive damages in the amount of $4,000,000 to right a wrong that could never be undone and set an example to deter the defendant and others similarly situated from this and similar kinds of conduct in the future.

## FIFTH CLAIM FOR RELIEF

### California Laws Violated

### AB 263 signed into law in 2013

### SB 1001 signed into law in September of 2016

64. Walmart and its staff of employed managers violated California laws AB 263 signed into law in 2013 which prohibits document abuse **when done in**

25

Employment Discrimination Complaint

**retaliation** against current employees such as employees who have already been hired & SB 1001 signed into law in September of 2016 which prohibit Document Abuse, **under any context**, including at the point of hire.

65. While attending orientation on December 5, 2023, and after returning with his A-number to complete his I-9 form, Roseman's valid work authorization documents were rejected demanding to see his lawful Resident Alien "Green Card". Roseman provided his unexpired California Driver's License and his unrestricted Social Security Card. Roseman was not allowed to complete his I-9 form while the managers insisted on seeing his lawful Resident Alien "Green Card" which had been stolen. While speaking with the two managers during orientation asking if he could complete his I-9 form he was ridiculed, intimidated, and repeatedly denied. As a result, Roseman was wrongfully terminated for no reason because the managers would not allow him to complete his I-9 form.

66. Walmart and its staff of employed managers violated AB 263 & SB 1001:

- AB 263 ~ Document Abuse **when done in Retaliation**;
- SB 1001 ~ Document Abuse **under any context**.

67. Walmart and its employed staff of managers for which Walmart is responsible for their selection, hiring, promotion, training, and actions violated the public trust hiring employees from within the surrounding and local areas then intentionally discriminating against them, intentionally discriminating against Roseman using Unfair Documentary Practices / Document Abuse and Intimidating him while not allowing him to complete his I-9 form which resulted in Wrongful Termination of employment.

68. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused

Employment Discrimination Complaint

resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $400,000.

69. Walmart should be assessed punitive damages in the amount of $4,000,000 to right a wrong that could never be undone and set an example to deter the defendant and others similarly situated from this and similar kinds of conduct in the future.

## SIXTH CLAIM FOR RELIEF

### Violation of The Immigration and Nationality Act's (INA) Anti-Discrimination Provision, 8 U.S.C. § 1324b

70. Walmart and its staff of employed managers violated The Immigration and Nationality Act's (INA) anti-discrimination provision, 8 U.S.C. § 1324b:

3) Unfair documentary practices: related to verifying the employment eligibility of employees. Under the law that IER enforces, when verifying a workers' employment authorization, employers of any size are not allowed to demand more or different documents than necessary, request specific documents, or reject reasonably genuine-looking documents because of a worker's citizenship, immigration status, or national origin.  This type of discrimination generally happens during the Form I-9 and E-Verify processes.  The part of the law that prohibits this type of discrimination is at 8 U.S.C. § 1324b(a)(6).

4) Retaliation/Intimidation: Employers of any size are not allowed to intimidate, threaten, coerce, or retaliate against individuals for filing charges with IER,

Employment Discrimination Complaint

cooperating with an IER investigation, opposing action that may constitute unfair documentary practices or discrimination based upon citizenship status, or national origin, **or otherwise asserting their rights under the INA's anti-discrimination provision**. Learn more about unlawful intimidation and retaliation by contacting IER and at 8 U.S.C. § 1324b(a)(5).

71. After returning to Walmart on December 6, 2023, to speak with a different manager Roseman was not allowed to complete his I-9 form. Roseman was accused of wrong-doing and retaliated against after stating it was against the law to discriminate against him by Unfair Documentary Practices, not allowing him to complete his I-9 form, and that he had made an online complaint with the United States Department of Justice, Civil Right Division, Immigrant and Employee Section. Roseman was accused of wrong-doing and retaliated against resulting in Wrongful Termination of his employment.

72. Walmart and its staff of employed managers violated The Immigration and Nationality Act's (INA) anti-discrimination provision, 8 U.S.C. § 1324b:

- Unfair Documentary Practices / Document Abuse;
- Retaliation & Intimidation / Discriminatory Harassment;

**After Roseman asserted his rights under the INA's anti-discrimination provision and informing the manager he had submitted a complaint with the United States Department of Justice, Civil Right Division, Immigrant and Employee Section.**

73. Walmart and its employed staff of managers for which Walmart is responsible for their selection, hiring, promotion, training, and actions violated the public trust hiring employees from within the surrounding and local areas then intentionally discriminating against them, intentionally discriminating against Roseman using Unfair Documentary Practices / Document Abuse and Retaliation

28

Employment Discrimination Complaint

while not allowing him to complete his I-9 form which resulted in Wrongful Termination of employment.

74. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $230,000.

75. Walmart should be assessed punitive damages in the amount of $2,300,000 to right a wrong that could never be undone and set an example to deter the defendant and others similarly situated from this and similar kinds of conduct in the future.

## SEVENTH CLAIM FOR RELIEF

### California Laws Violated

### AB 263 signed into law in 2013

### SB 1001 signed into law in September of 2016

76. Walmart and its staff of employed managers violated California laws AB 263 signed into law in 2013 which prohibits document abuse **when done in retaliation** against current employees such as employees who have already been hired & SB 1001 signed into law in September of 2016 which prohibit Document Abuse, **under any context**, including at the point of hire.

77. After returning to Walmart on December 6, 2023, to speak with a different manager Roseman was not allowed to complete his I-9 form. Roseman was accused of wrong-doing and retaliated against after stating it was against the law to

29

Employment Discrimination Complaint

discriminate against him by Unfair Documentary Practices, not allowing him to complete his I-9 form, and that he had made an online complaint with the United States Department of Justice, Civil Right Division, Immigrant and Employee Section. Roseman was accused of wrong-doing and retaliated against resulting in Wrongful Termination of his employment.

78. Walmart and its staff of employed managers violated AB 263 & SB 1001:

- AB 263 ~ Document Abuse **when done in Retaliation**;
- SB 1001 ~ Document Abuse **under any context**.

79. Walmart and its employed staff of managers for which Walmart is responsible for their selection, hiring, promotion, training, and actions violated the public trust hiring employees from within the surrounding and local areas then intentionally discriminating against them, intentionally discriminating against Roseman using Unfair Documentary Practices / Document Abuse and Retaliation while not allowing him to complete his I-9 form which resulted in Wrongful Termination of employment.

80. Discriminatory harassment and intimidation occurred in conjunction with this discrimination. Roseman was emotionally and psychologically abused resulting in injury. The discrimination is still ongoing. Walmart has denied any wrongdoing, has not provided an explanation or apology, and continues to subject Roseman to extended periods of discrimination. As a result of the above-described conduct, plaintiff suffered, continues to suffer, and may permanently suffer from embarrassment, fear, humiliation, anger, and indignity, all to his noneconomic damages in the amount of $230,000.

81. Walmart should be assessed punitive damages in the amount of $2,300,000 to right a wrong that could never be undone and set an example to deter the

30

Employment Discrimination Complaint

defendant and others similarly situated from this and similar kinds of conduct in the future.

## PRAYER

WHEREFORE, plaintiff prays for judgement against said defendant, Walmart, Inc. noneconomic damages of $1,680,000 for all noneconomic claims for relief and punitive damages of $16,800,000 for all punitive claims for relief.

Dated: August 20, 2024

Signed: _____

Sean S Roseman

(442) 999-1332

Naturalemerald04@gmail.com

31

Employment Discrimination Complaint

# EXHIBIT A

Employment Discrimination Complaint

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Los Angeles District Office**
255 East Temple St, 4th Floor
Los Angeles, CA 90012
(213) 785-3090
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/29/2024

**To:** Mr. Sean S. Roseman
6100 Newcomb Street
San Bernardino, CA 92404
Charge No: 480-2024-01091

EEOC Representative and email:    MICHELLE SILVERS
EEOC INVESTIGATOR
MICHELLE.SILVERS@EEOC.GOV

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Christine Park-Gonzalez
05/29/2024

Christine Park-Gonzalez
District Director

Cc:
Scott A Forman
Walmart c/o Littler Mendelson, P.C.
2301 MCGEE ST STE 800
Kansas City, MO 64108


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 480-2024-01091 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor, Los Angeles, CA 90012.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 480-2024-01091 to the District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor, Los Angeles, CA 90012.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.